IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

IN RE: CHRISTOPHER AND RACHEL MOUTON,
    Debtors.

CASE NO. 4:11-BK-16479
Chapter 13

CHRISTOPHER S. MOUTON                    PLAINTIFF

VS.                                                            AP NO. 4:11-AP-1275

TOYOTA MOTOR CREDIT CORP.,            DEFENDANTS
FIRST SECURITY BANK

## MEMORANDUM OPINION

Christopher S. Mouton (Debtor), one of the joint debtors in this Chapter 13 case, filed this adversary proceeding against Toyota Motor Credit Corporation (Toyota) and First Security Bank (Bank). In his complaint, the Debtor seeks a determination as to the validity and extent of liens and an avoidance of liens and/or a declaratory judgment regarding liens held by Toyota and the Bank in the Debtor's 2009 Toyota Corolla automobile.

Toyota and the Bank separately answered the complaint, and after a trial on the merits, the Court ruled that Toyota's lien was perfected but that the Bank's lien was not. Upon further reflection, the Court decided to take under advisement the issue of whether Toyota's lien was perfected. The Debtor and each defendant filed post-trial briefs. In its brief, the Bank seeks reconsideration of the Court's bench ruling that the Bank's lien in the automobile is unperfected.

The Court has jurisdiction to decide this matter in accordance with 28 U.S.C. §§ 1334 and 157(a). This matter is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(K). The following opinion constitutes the Court's findings of fact and conclusions of law pursuant to

1

Federal Rule of Bankruptcy Procedure 7052.

FACTS

A separate dischargeability action filed by the Bank against the Debtor was tried before the Court prior to the trial in this case. See First Security Bank v. Mouton, 4:11-ap-01269. In that adversary proceeding, certain facts were established that provide background for the instant case.

In the course of the previous trial, the facts demonstrated that the Debtor had received checks drawn on banks in Canada that were subsequently determined to be counterfeit. The Bank initially gave the Debtor provisional credit for these deposits. The Debtor then used some of the funds for payments to various third parties for a variety of reasons prior to the deposits being reversed when the checks were returned by the Canadian banks as counterfeit forgeries. These facts do not appear in the record in the instant case and are not relevant to the Court's determination, but are recited to explain more fully why the relevant events in August, September, and October 2011 occurred.

In this case, the evidence shows that on April 29, 2009, the Debtor purchased a Toyota Corolla automobile in Decatur, Illinois, for $29,935.43. (Tr. at 20, 39, Pl.'s Ex. 1.) Toyota was noted as first lien holder on the face of the certificate of title, which was issued in Illinois. (Tr. at 39, Pl.'s Ex. 1.) The Debtor commenced making regular monthly car payments to Toyota.

At some point not precisely shown by the record, the Debtor moved to Arkansas and was living there by August 2011. In early August 2011, the Debtor logged on to the Toyota website to ascertain the balance owed on the car. (Tr. at 21.) On August 13, he electronically transferred from his account at the Bank to Toyota the sum of $23,624.12, which was the

principal balance owed. (Tr. at 22, 34, Toyota Ex. 2 at 4.) When he made the transfer, his account balance at the Bank showed sufficient funds to defray the total indebtedness. (Tr. at 22.)

A day or so later, the Debtor examined his Toyota account online and found the account reflected a zero balance due. (Tr. at 22.) About a week later, he received the certificate of title in the mail with the release portion executed by Toyota. (Tr. at 23, 36.)

At trial, Greg Jacoby, a sales manager with Toyota, explained the procedure Toyota follows when it receives automated notice of payoff. Toyota "pulls" the certificate of title, signs the release on the face of the document, and then sends the title reflecting the lien release to the owner of the vehicle. (Tr. at 42.) Toyota's policy is to hold the certificate of title for ten days after payoff before sending it to the owner. (Tr. at 54.)

On August 18, 2011, Toyota received notice that the transaction with the Debtor was uncollectible, and on August 19, Toyota reversed the payoff notation on the vehicle. (Tr. at 42-43.) Toyota did not immediately notify the Debtor of the denied payment because, in addition to the reversed payoff, the Debtor had made his regular monthly car payment in August, so his account was current through August. (Tr. at 66.) Despite the reversed payoff, the certificate of title was erroneously sent to the Debtor by Toyota. According to Jacoby, Toyota's "paid in full department did not receive notice to hold up the release of the title." (Tr. at 64.)

Toyota sent the Debtor a form letter dated October 5, 2011, stating that the online payment was returned to Toyota for insufficient funds. (Toyota Ex. 3.) In the letter, Toyota gave the Debtor a certain amount of time to pay the full amount owed, or return the certificate of title and take action to assist Toyota in reinstating the lien. (Tr. at 44, Toyota Ex. 3.) The Debtor

3

filed for bankruptcy protection under Chapter 13 on October 6, 2011, and received the October 5 form letter post-petition. (Chapter 13 Voluntary Petition, docket entry 1; Tr. at 31.)  Later, in response, to the form letter, the Debtor sent the title back to Toyota.

During the August-October 2011 period when the transactions between the Debtor and Toyota occurred, the Debtor also had dealings with the Bank concerning the counterfeit funds in his account with the Bank.  The Debtor informed the Bank that the funds were counterfeit on August 16 or 17.  (Tr. at 33.)  At about that time, the Debtor entered into an agreement with the Bank to borrow funds from the Bank to correct the "shortfall . . . in his account" created when he used the counterfeit funds to pay third parties. (Tr. at 71, 72.)

The Debtor gave the Bank a note for $60,464.87, and he offered the Toyota Corolla as collateral for the loan. (Pl.'s Ex. 2, Tr. at 17.)  Because Toyota had released its lien on the certificate of title and sent the title to the Debtor, the Debtor believed and represented to the Bank when he entered into the agreement that the car was unencumbered. (Tr. at 69.)  The Debtor and a Bank official testified that when the note itself was executed on September 16, 2011, neither the Debtor nor the Bank employees he was dealing with were aware that the earlier August payoff to Toyota was ineffective. (Tr. at 36, 37, 74, 76.)  The Debtor's account statement did not reflect that the electronic payoff to Toyota had been declined.  (Tr. at 76.)  Therefore, the Debtor's and the Bank's calculation of the shortfall in the account did not include the $23,624.12 reversed payment to Toyota. (Tr. at 72.)

On September 16, 2011, the Debtor executed various loan documents which included a security agreement granting the Bank a security interest in the car. (Pl.'s Ex. 2.)  After executing the loan documents, the Debtor was given the certificate of title to the car with the Bank's lien

4

noted on the face of the title and instructed to file the appropriate papers with the Revenue Office of the State of Arkansas. However, the Debtor failed to do so and three weeks later filed his bankruptcy petition. (Tr. at 18, 70.) The Bank admitted its lien had not been perfected by filing with either the Arkansas Department of Finance and Administration or the Illinois Department of Motor Vehicles. (Tr. at 74-75, 79.)

Either one or two weeks after the note to the Bank was executed, the Debtor spoke to a Toyota employee by telephone and learned the August 13 online payment to Toyota had been rejected by the Bank. (Tr. at 17.) His discovery of the fact that Toyota did not receive good funds is what prompted the Debtor to file for bankruptcy. (Tr. at 37.) The Bank admitted that it dishonored or prevented the Debtor's attempted transfer of the money from his account to Toyota. (Pl.'s Ex. 4.) The Debtor concedes that he owes Toyota for the car. (Tr. at 23.)

## Bank's Request for Reconsideration

The Court will first address the Bank's request for reconsideration of the initial ruling that the Bank's security interest is unperfected.

The Court understands the Bank's position to be that the filing of the bankruptcy petition on October 6, 2011, stayed the Bank from perfecting its security interest in the car. Had the bankruptcy not intervened, state law would have permitted the Bank to perfect its lien by filing its security agreement and certificate of title within thirty days after September 16, 2011, the date of the execution of the documents, and the date of perfection would then relate back to September 16. The Bank argues that because the bankruptcy filing stayed the Bank from perfecting its interest within thirty days of the execution of the documents as state law permitted, it should be granted an equitable lien.

As to perfecting a security interest, the Bank correctly identifies the applicable Arkansas statute. The law provides that if copies of the security agreement and certificate of title "are received and filed in the Office of Motor Vehicle within thirty (30) days after the date the documents were executed, the lien is deemed to have been perfected on the date of the execution of the documents." Ark. Code Ann. §§ 27-14-802, 805 (Michie 2008).

However, the Bank is incorrect in its assertion that the automatic stay prevented it from filing the documents pursuant to state law. Section 362 of the Bankruptcy Code provides for various exceptions to the automatic stay. One of these exceptions permits "any act to perfect . . . an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title. . . ." 11 U.S.C. § 362(b)(3) (2006). The relevant portion of section 546(b) provides that a trustee's rights and powers under sections 544, 545, and 549 "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection. . . ." 11 U.S.C. § 546(b)(1)(A). This limitation of a trustee's powers applies to post-petition perfection of liens and interests "that relates back to a pre-petition event and defeats the rights of an intervening creditor." Holbrook v. Country Mut. Ins. Co. (In re Burnett), 447 B.R. 634, 644 (Bankr. W.D. Okla. 2011) (citing Malloy v. St. John Med. Ctr. (In re Woodward), 234 B.R. 519, 527 (Bankr. N.D. Okla.1999)).

The import of the exception is that "'the filing of a bankruptcy petition does not prevent the holder of an interest in property from perfecting its interest if, absent the bankruptcy filing, the interest holder could have perfected its interest against an entity acquiring rights in the property before the date of perfection.'" Rios v. Banco Popular De Puerto Rico (In re Rios),

6

420 B.R.57, 69 (Bankr. D.P.R. 2009) (quoting 229 Main St. Ltd. Pshp. v. Mass. EPA (In re Main St. Ltd. Pshp.), 262 F.3d 1, 12 (1st Cir. 2001)) (quoting 5 Collier on Bankruptcy ¶ 546.03 [2][a] (15th ed. 2009).

In the instant case, the Bank, under state law, was allowed 30 days after execution of the security agreement to perfect its security interest, and the perfection date would have been deemed to be the date of execution of the security documents, September 16. If, outside of bankruptcy, the Bank had perfected its security interest within the 30-day period, the Bank's interest would have been superior to that of a lien creditor intervening within the 30-day period. Ark. Code Ann. § 4-9-317(a)(1) & (2)(A) (Michie 2001). A bankruptcy trustee is a lien creditor from the date the bankruptcy petition is filed. Ark. Code Ann. § 4-9-102 (a)(52)( C) (Michie 2001). Under Section 546(b), a trustee's rights and powers as a lien creditor would be subject to Sections 27-14-802 and 805 of the Arkansas Code regarding the relation back of the Bank's perfection date.

Since, in this case, a trustee's interest as a lien creditor would have been inferior to the Bank's security interest if perfected withing 30 days of execution under state law, the Bank could have perfected after bankruptcy but within the 30-day limit. The Bankruptcy Code would have allowed the Bank to perfect its lien after the petition was filed pursuant to Sections 362(b)(3) and 546(b) in accordance with this exception to the stay. However, Section 546 "'does not come into play' unless the creditor actually exercises her bankruptcy right to perfect post-petition so as to trigger her state law right of relation-back priority." David G. Epstein et al., Bankruptcy 398 (1993)(quoting David G. Epstein et al., 2 Bankruptcy Practitioner Treatise Series (1992)).

Contrary to the Bank's assertions, the stay was no impediment to post-petition perfection. The Bankruptcy Code afforded the opportunity to perfect despite the bankruptcy filing and the automatic stay. The Bank did not, however, avail itself of that opportunity. Under these circumstances, imposing an equitable remedy is not justified, and the Bank's request for reconsideration is denied.

## **The Validity, Priority and Extent of Toyota's Lien**

The issue with regard to Toyota is whether, despite the execution of lien release and delivery of the certificate of title, Toyota's security interest in the car remains perfected. In his complaint, the Debtor asserts that because Toyota released its lien pursuant to statute, the lien is no longer valid or enforceable. While Toyota concedes in its brief that it signed the release of lien on the certificate of title and sent the certificate to the Debtor, Toyota nevertheless argues several points to support its position that it retains a validly perfected purchase money security interest in the car. Each of these arguments will be addressed in turn below.

In his brief, the Debtor correctly points out that the status of Toyota's lien is to be determined according to Illinois law. Arkansas law provides, "If a vehicle is subject to a security interest when brought into this state, the validity of the security interest is determined by the law of the jurisdiction where the vehicle was when the security interest attached. . . ." Ark. Code Ann. § 27-14-802(b) (Michie 2008).

The attachments to Toyota's proof of claim evidence the loan agreement between the seller and the Debtor, both with addresses in Illinois; the Debtor's grant of a security interest in the vehicle; and an Illinois certificate of title to the car showing the Debtor as owner and Toyota as lien holder. (Pl.'s Ex. 1.) It is undisputed that the vehicle was in Illinois when the security

8

interest attached and that Toyota validly perfected its security interest by complying with the provisions of 625 Ill. Comp. Stat. 5/3-202(b) (West 2008).[1] The parties also do not dispute that Toyota held a validly perfected lien in the car when the Debtor moved from Illinois to Arkansas. Thus, Illinois law applies to the status of the lien.

### Whether Satisfying the Security Interest is a Prerequisite to Lien Release

Toyota first argues that because the Debtor did not defray the underlying indebtedness to Toyota, the security interest was not satisfied and no valid lien release could be accomplished.

The applicable Illinois statute provides the following method for releasing a vehicle lien:

> (a) Within 21 days after receiving payment to satisfy a security interest in a vehicle for which the certificate of title is in the possession of the lienholder, he shall execute a release of his security interest, and mail or deliver the certificate and release to the next lienholder named therein, or, if none, to the owner. . . . If the payment is in the form of cash, a cashier's check, or a certified check, the number of days is reduced to 10 business days. . . .

625 Ill. Comp. Stat. 5/3-205 (West 2003).

Execution of the lien release on the certificate of title as provided by the statute is "the accepted method by which liens are released and by which public notice is given of the release of motor vehicle liens." In re Lortz, 344 B.R. 579, 584 (Bankr. C.D. Ill. 2006). The statute sets out the process to release a security interest in a motor vehicle in two steps: execute a release and then mail or deliver the release and certificate of title to the next lienholder or, if none, to the

---

[1] The statute provides, "A security interest is perfected by the delivery to the Secretary of State of the existing certificate of title, if any, an application for a certificate of title containing the name and address of the lienholder and the required fee. The security interest is perfected as of the time of its creation if the delivery . . . is completed within 30 days after the creation of the security interest or receipt by the new lienholder of the existing certificate of title from a prior lienholder or licensed dealer, otherwise as of the time of the delivery."

9

owner. Id.

Toyota accomplished both steps prior to the bankruptcy filing but contends that, pursuant to Section 3-205, its lien release was not effective because its security interest was not satisfied with final payment.

Toyota's argument that Section 3-205 requires satisfaction of the security interest has been addressed and rejected by an Illinois bankruptcy court. That court has asserted,

> Although Section 3-205 requires a creditor to release its security interest within 21 days after payment of the secured loan, it is clear that this section does not make full payment a prerequisite to a valid release. There is no question that a secured party has the power to release the security interest or only the lien before full payment of the secured debt. . . . For example, a security interest in collateral may be voluntarily terminated where it is deemed by the creditor to be worthless or where the debtor is substituting other collateral.

344 B.R. at 584, 585 n. 3.

In short, the statute requires that if full payment of the secured loan is made, the security interest in the collateral must be released within either ten or 21 days, depending on the form of payment, but the statute does not make full payment of the secured loan one of the necessary steps in a valid release of the security interest. The Court concludes that the Debtor's failure to satisfy the loan indebtedness prior to Toyota's release has no effect on the validity of the release.

Under Illinois law, the certificate of title identifies the vehicle owner and any lien holders, and the public may rely on the information as it appears on the title. Id. at 584 (citing 625 Ill. Comp. Stat. 5/3-107 ( c)(West 2009)(certificate of title is prima facie evidence of facts appearing on it)). Illinois law provides that the certificate of title is the exclusive method for giving notice of security interests in a motor vehicle. 625 Ill. Comp. Stat. 5/3-207. Thus, a lien

release on the title is notice of its termination "which may be relied upon by a transferee or lender so that they take free and clear of the released lien." In re Lortz, 344 B.R. at 585. Giving up possession of title is the final step in the process that places the title back in the stream of commerce where it may be relied upon by third party purchasers and lien holders. Id.

    Both steps to a valid lien release having been accomplished under Illinois law, Toyota's security interest in the vehicle was unperfected on the day the Debtor filed his bankruptcy petition.

### Whether the Bank and the Debtor Detrimentally Relied on the Release

    Toyota's second argument is that the Bank and the Debtor did not detrimentally rely on the signed release because the Debtor had already expended the funds to be lent by the Bank and because testimony from the Bank and the Debtor indicated they would have entered into the loan agreement regardless of whether collateral was pledged. Toyota neglects to mention that the Bank's officer also testified the Bank offered the Debtor a lower interest rate based on the fact that unencumbered collateral partially secured the loan. (Tr. at 70.)

    Toyota supports this argument with a statement by a bankruptcy court in Illinois interpreting the state statute that is a precursor to Section 3-205 cited above. In that case, the debtor gave the bank a security interest in a Chevrolet Corvette as collateral for a bank loan. In contemplation of the sale of the vehicle and satisfaction of the indebtedness, the bank executed the release of lien on the certificate of title. The sale was never consummated, and the bank retained possession of the certificate with the release of lien still noted on the face. The debtor subsequently filed a bankruptcy petition, and the trustee sought to avoid the transfer of the lien because of the release of lien on the face of the title.

The court stated that "**[i]f the Bank had relinquished possession of the certificate of title,** thereby creating the **possibility** that third parties would take positions in reliance of the bank's executed release form, the Bank would be estopped from claiming that it had a valid lien in the Corvette, **even if its security interest was not satisfied**." (emphasis added) Mottaz v. Mid America Bank & Trust Co. (In re Office Machines Exchange Inc.), 47 B.R. 644, 647 (Bankr. S.D. Ill. 1985).

In Mottaz, the bank retained possession of the certificate, and, thus, the possibility of detrimental reliance by third parties was nonexistent. In the instant case, Toyota executed the release and relinquished the certificate, creating the potential for precisely the type of detrimental reliance that the Mottaz court determined would permit the trustee to avoid the lien. Further, the Mottaz court finds that when a lien release and relinquishment creates even the possibility of detrimental reliance by third parties, the transfer of lien is potentially avoidable. For these reasons, the Court rejects Toyota's third-party reliance argument.

### Whether a Chapter 13 Debtor May Exercise Trustee Avoidance Powers

Third, Toyota asserts that the Bankruptcy Code does not permit this Chapter 13 Debtor to exercise the trustee's powers pursuant to 11 U.S.C. § 544 to avoid Toyota's lien. Without specifying an authorizing statute, the Debtor's complaint contends that the Bank's lien should be avoided, but makes no mention of avoiding Toyota's lien. Nevertheless, the Court will address this question as it relates to both liens at issue.

The majority view is that a Chapter 13 debtor has no standing to bring such a trustee avoidance action. Hansen v. Green Tree Servicing LLC (In re Hansen), 332 B.R. 8, 11 n. 14 (B.A.P. 10th Cir. 2005) (citing In re Knapper, 407 F.3d 573, 583 (3d Cir. 2005) (Chapter 13

debtor could not invoke § 544(b)(1); the avoidance power belongs to the trustee); In re Stangel, 219 F.3d 498, 501 (5th Cir. 2000) (Chapter 13 debtors lacked standing to bring a § 545 avoidance action); LeBarge v. Benda (In re Merrifield), 214 B.R. 362, 365 (B.A.P. 8th Cir. 1997) (only the trustee has avoidance power under § 548); Estate Constr. Co. v. Miller & Smith Holding Co., Inc., 14 F.3d 213, 220 (4th Cir. 1994) (debtors could not pursue section 548 avoidance action)). But see Houston v. Eiler (In re Cohen), 305 B.R. 886 (9th Cir. B.A.P. 2004)(Chapter 13 debtors could avoid an unperfected security interest by using trustee's strong-arm powers under Section 544 to benefit the estate).

However, Section 522(h) of the Bankruptcy Code provides one exception that allows a debtor to avoid transfers of exempt property pursuant to trustee avoidance powers. In re Merrifield, 214 B.R. at 365 (citing Realty Portfolio, Inc, v. Hamilton (In the Matter of Hamilton), 125 F.3d 292 (5th Cir. 1997); DeMarah v. United States (In re DeMarah), 62 F.3d 1248 (9th Cir. 1995)). Section 522(h) "empowers the debtor to use the trustee's avoiding powers to create equity for the estate that may be claimed as exempt by the debtor. The debtor, however, may avoid only liens that encumber property the debtor could have exempted under § 522(g)(1),–that is, only liens that were involuntarily imposed on property the debtor did not conceal." In re Brennan, 208 B.R. 448, 452 (Bankr. S.D. Ill. 1997).

In the instant case, both liens at issue were consensual. Thus, the statute permitting a debtor to exercise the trustee's avoidance powers is inapplicable. Because the Debtor fails to satisfy the requirements of Section 522(g)(1) and (h) and because the majority view is that a Chapter 13 debtor lacks standing to assert the trustee's avoidance powers on some other basis, the Court concludes that the Debtor may not avoid either lien at issue on this basis.

### **Whether Toyota's Post-Petition Possession of the Title Certificate Reinstates the Lien**

Fourth, the Court rejects Toyota's argument that by regaining possession of the certificate of title to the car, Toyota has canceled the release. Toyota cites no case law or statute to support this assertion. Under federal bankruptcy law, the imposition of the automatic stay would nullify any subsequent attempt by the Debtor and Toyota to reinstate the lien while the Debtor's bankruptcy was pending. 11 U.S.C. § 362 (a)(4) & (5) (2012) (bankruptcy petition operates as a stay of any act to create, perfect, or enforce any lien against property of the estate or property of the debtor if the lien secures a pre-petition claim).

### **Whether Toyota Is Entitled to Equitable Reinstatement of Lien**

Fifth, Toyota urges the Court to use its equitable powers to reinstate the lien because Toyota's mistaken release did not prejudice innocent third parties and because the Debtor will obtain, to the detriment of unsecured creditors, a windfall in the form of an exempted, lien-free vehicle due to his own wrongdoing or neglect. An objection to the Debtor's claim of exemptions filed by the Chapter 13 Trustee is pending but not currently before the Court (Court Docket Entry Number 24), and the Trustee is not a party to the instant proceeding. It would be premature and speculative for the Court to base the outcome of this litigation on what exemption strategy the Debtor may pursue as a result of the resolution of that objection.

As to employing its equitable powers to reinstate the lien because it was released by mistake and does not prejudice innocent third parties, the Court first turns to the question of the present status of Toyota's and the Bank's security interest under state law. The applicable Uniform Commercial Code section, enacted in both Illinois and Arkansas, provides that "Except

14

as provided in the Uniform Commercial Code, a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors." Ark. Code Ann. § 4-9-201(a) (Michie 2001); 810 Ill. Comp. Stat. 5/9-201 (West 2001).

Pursuant to this provision, a security agreement is generally effective according to its terms as between the parties. Lawhon Farm Supply Inc. v. Hayes, 316 Ark. 69, 74, 870 S.W.2d 729, 731 (1994); Metropolitan Life Ins. Co. v. American Nat'l Bank & Trust Co., 682 N.E. 2d 72, 77 (Ill.App.Ct. 1997). At trial, neither Toyota nor the Bank disputed that each of them holds an effective security agreement with regard to the Debtor and the collateral, but the facts also show that neither security interest was perfected at the time of the bankruptcy filing. Under the Uniform Commercial Code, protection is provided to holders of unperfected interests by making such interests enforceable between the parties to the security agreement but vulnerable to the claims of third parties. United States v. Trigg, 465 F.2d 1264, 1268-69 (8th Cir. 1972).

Accordingly, both the Bank and Toyota hold unperfected security interests at the present time. The Uniform Commercial Code sets out the priority as to unperfected security interests in the same collateral: "The first security interest . . . to attach or become effective has priority if conflicting security interests . . . are unperfected." Ark. Code Ann. § 4-9-322(a)(3) (Michie 1991); 810 Ill. Comp. Stat. 5/9-322(a)(3) (West 2002). The Debtor purchased the car and signed a retail installment contract, which included the granting of the security interest, on April 29, 2009. (Pl.'s Ex. 1.) The Bank's security agreement is dated September 16, 2011. (Pl.'s Ex. 2.) Toyota's security interest attached or became effective first; therefore, the Bank's security interest is subordinate to that of Toyota.

With regard to this UCC provision on priorities between unperfected security interests,

one comment is particularly instructive: "[I]t is hard to imagine a situation where the case would come into litigation without either secured party's having perfected its security interest. If neither security interest had been perfected at the time of the filing of a petition in bankruptcy, ordinarily neither would be good against the trustee in bankruptcy under the Bankruptcy Code." UCC § 9-322 cmt. 11 (1961).

Although the Trustee is not a party to this proceeding, the Court is mindful of a potential trustee avoidance action that would be precluded were the Court to reinstate Toyota's lien.[2] Moreover, reinstating Toyota's lien would render moot the Trustee's pending objection to confirmation of plan based on a violation of the best interests of creditors test. At this juncture in the case, it is inappropriate for the Court to use its equitable powers in a manner that upsets the Bankruptcy Code's distribution scheme and potentially eliminates substantive rights of third parties who are subject to that scheme. Accord Rouse v. Chase Manhattan Bank (In re Brown), 226 B.R. 39, 44-45 (Bankr. W.D. Mo. 1998)(declining to use equitable power to override the fact that creditor perfected its lien within the preference period, thus subjecting lien to avoidance by the trustee; equitable doctrines may not be used to directly circumvent the result intended by the Bankruptcy Code).

In a recent Seventh Circuit opinion by Chief Judge Easterbrook, the court opined that

> [w]hat the Bankruptcy Code provides, a judge cannot override by declaring that enforcement would be 'inequitable' . . . There are hundreds of bankruptcy judges, who have many different ideas about what is equitable in any given situation. . . .

---

[2] This Court has never decided the issue of whether a Chapter 13 Trustee is entitled to exercise the trustee avoidance powers. Even if an avoidance action were not pursued in the Chapter 13 case, conversion to Chapter 7 and the appointment of a trustee is a possibility. Also, whether a lien could be avoided by the trustee in a hypothetical chapter 7 is a relevant inquiry in a chapter 13 confirmation hearing where the best interests of creditors is at issue.

> Recently the Supreme Court emphasized that arguments based on views about the purpose behind the Code and wise public policy cannot be used to supersede the Code's provisions. It remarked: 'The Bankruptcy Code standardizes an expansive (and sometimes unruly) area of the law and it is our obligation to interpret the Code clearly and predictably using well established principles of statutory construction.'
>
> Sunbeam Products, Inc. v. Chicago American Mfg., LLC, 686 F.3d 372, 375-76 (7th Cir. 2012) (quoting RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S.Ct. 2065, 2073 (2012)).

To support its position that its lien should be equitably reinstated, Toyota cites the case of Billingsley v. Helena National Bank (In re Billingsley), in which a mortgagee mistakenly released a mortgage lien and then later corrected the mistake within the preference period. 175 B.R. 286 (Bankr. Ark. 1994). The Court noted that Arkansas law affords a mortgagee an equitable remedy to reinstate a mortgage lien mistakenly released, provided innocent third parties are not affected. However, the Court based its finding in the mortgagee's favor on the fact that no transfer of an interest of the debtor had occurred when the release was corrected within the preference period because the mortgagee had already assigned the deed of trust to a third party when it mistakenly released the lien. Thus, the holding of the Court in Billingsley does not depend on an equitable remedy and is not relevant to the instant case.

The Court is reluctant to apply the state law rule permitting the equitable reinstatement of mortgage liens to the facts in this case, which are governed by the Uniform Commercial Code's provisions on security interests in personal property, not real property law. In a bankruptcy case with facts similar to those in the instant case, the court found it inappropriate to use its equitable powers. See McRoberts v. Transouth Financial (In re Bell), 194 B.R. 192, 196 (Bankr. S.D. Ill. 1996)(stating "equitable liens arising under state law are contrary to the letter and purpose of the Bankruptcy Code").

17

Although Toyota released its lien by mistake, it would be unfair to reinstate the lien without also rectifying the "mistakes" made by the Debtor and the Bank that arose out of the same set of unfortunate circumstances. Consequently, the Court declines to exercise its equitable powers to reinstate Toyota's lien.

## CONCLUSION

With Toyota's execution of lien release and return of title to the Debtor, Toyota's security interest became unperfected under Illinois law. Both Toyota and the Bank hold unperfected security interests in the same collateral; the Bank's security interest is subordinate to that of Toyota. The Debtor may not avoid Toyota's or the Bank's security interests using the trustee's avoidance powers. The consequences resulting from the unperfected status of the two liens will be determined at the hearing on the Chapter 13 Trustee's pending objection to confirmation. See, e.g., In re Beene, 354 B.R. 856, 862 (Bankr. W.D. Ark. 2006) (declining to confirm chapter 13 plan which failed "best interests of creditors test" because unsecured creditors would receive more in a chapter 7 case where trustee could avoid unperfected mortgagee's lien).

IT IS SO ORDERED.

Dated: 09/07/2012

JAMES G. MIXON
UNITED STATES BANKRUPTCY JUDGE

cc: John B. Buzbee, Esq.
    Robert Danecki, Esq.
    Gary Jiles, Esq.
    Mark T. McCarty, Chapter 13 Trustee